Adam B. Gottlieb (New York Bar No. 4399135)
gottlieba@sec.gov
(202) 551-8299

Attorney for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Facsimile:  (301) 847-4705

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>      v.<br><br>CROWD MACHINE, INC., METAVINE, INC, and CRAIG DEREL SPROULE,<br><br>            Defendants,<br><br>and<br><br>METAVINE PTY. LTD.,<br><br>            Relief Defendant. | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against defendants Crowd Machine, Inc., Metavine, Inc., and Craig Derel Sproule (collectively, "Defendants"), and relief defendant Metavine Pty. Ltd., alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.      Between January and April 2018, defendant Craig Derel Sproule and his company, Metavine, Inc., together with its subsidiaries Crowd Machine, Inc. and Crowd Machine SEZC, raised more than $33 million from hundreds of investors in the United States and abroad through a fraudulent and unregistered "initial coin offering" or "ICO" of digital asset securities, which they called "Crowd Machine Compute Tokens" or "CMCTs."

2.      Defendants represented that ICO proceeds would be used to fund the development of a new technology—a "global decentralized" peer-to-peer network, or "Crowd Computer"—that Defendants claimed would run their existing "no-code" application-development software from a network of users' own devices instead of traditional centralized servers.  Defendants further represented that, once sold, CMCTs would be used by users to compensate device owners for the use of their surplus processing power, as well as to pay software developers for making available source code that users could compile into custom applications "with unparalleled speed."

3.      Defendants also represented that they would market this new technology, grow a "community" of CMCT holders, and work to increase demand for the tokens, thereby increasing the secondary market value of CMCTs on digital asset trading platforms.

4.      In reality, Defendants never operationalized the Crowd Computer, CMCT purchasers were never able to use the tokens within the Crowd Computer ecosystem, and the secondary market for CMCTs all but disappeared, along with any value that CMCTs might once have held for token holders.

5.       To make matters worse, Defendants materially misrepresented how it intended to use ICO proceeds.  Beginning during the ICO, Defendants sent more than $5.8 million to gold-mining companies in South Africa, purportedly in the form of loans or in exchange for equity interests in these mining operations.

6.      To date, Defendants have recovered almost none of the $5.8 million they misappropriated, and the South African gold mining operations have returned no revenue.

7.      Despite claiming total ICO proceeds of over $40 million, at least $33 million of which Defendants actually collected, Defendants now purport to lack sufficient capital to fund continued operations, in no small part because of these undisclosed payments to gold-mining companies with no connection to the underlying project for which Defendants purportedly conducted the ICO in the first place.

8.      The CMCTs Defendants offered and sold to investors were "securities" under the federal securities laws, which define "security" to include various investment vehicles, such as

2

stocks, bonds, and "investment contracts." Like the offer and sale of CMCTs, investment contracts are transactions involving the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. Numerous courts have found specifically that offers and sales of digital assets like CMCTs are investment contracts, and therefore that such digital assets are "securities" under the federal securities laws.

9.     Defendants never filed with the SEC a registration statement for their offer and sale of CMCTs, and this offer and sale did not qualify for an exemption from the registration requirements of the federal securities laws.

## **VIOLATIONS**

10.     By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

12.     The SEC brings this action pursuant to the authority conferred by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (d)(5)].

13.     The SEC seeks final judgments:

(a) permanently enjoining Defendants from violating the federal securities laws and rules they are alleged by this Complaint to have violated;

(b) permanently enjoining Defendants from participating, directly or indirectly, including, but not limited to, through any entity controlled by them, in any offering of securities, including any digital asset security;

(c) imposing upon Defendants civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d) requiring Defendants Crowd Machine, Inc. and Metavine, Inc. and Relief Defendant Metavine Pty. Ltd., jointly and severally, to disgorge ill-gotten gains and to pay prejudgment interest thereon;

(e) permanently prohibiting Sproule from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

(f) requiring Defendants Crowd Machine, Inc. and Metavine, Inc.to undertake to (i) permanently disable all Crowd Machine Compute Tokens ("CMCTs") in their possession or control within 10 days of the entry of the judgment, including any CMCTs owned by, beneficially owned by, or held in the name of Sproule; (ii) publish notice of the judgments on their websites and social media channels, in a form not unacceptable to Commission staff, within 10 days of the entry of the judgment; and (iii) issue requests to remove CMCTs from any further trading on all digital asset trading platforms where CMCTs are or may be trading, including any that they previously contacted to request trading of CMCTs, and publish notice of such requests on their websites and social media channels, in a form not unacceptable to Commission staff, within 10 days of the entry of the judgment; and

(g) requiring Sproule to undertake to cooperate with, and not object to, efforts by Crowd Machine, Inc. and Metavine, Inc. to disable any CMCTs owned by, beneficially owned by, or held in Sproule's name.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. §78aa(a)].  At all relevant times, defendants Metavine, Inc. and Crowd Machine, Inc. were headquartered in this District. Many of Defendants' transactions, acts, practices, and courses of business constituting the violations alleged herein also occurred within this district.

## DEFENDANTS

17.     **Craig Derel Sproul**, age 55, is a citizen of Australia.  Sproule is the founder, principal, and controlling shareholder of Metavine, Inc.

18.     **Metavine, Inc.** was incorporated in 2013 in Delaware as "Wasp Software Inc.," which changed its name to Metavine, Inc. in 2014.  Its principal place of business is 100 Enterprise Way, Suite B104, in Scotts Valley, California.  Metavine, Inc. is controlled by Craig Sproule, who holds approximately 30% of the equity in Metavine, Inc. and is its largest shareholder.  Metavine, Inc.'s remaining equity appears to be divided primarily among private equity firms and their privately held investment funds.

19.     **Crowd Machine, Inc.** was incorporated in Delaware in 2018 and is owned entirely by Metavine, Inc.  It shares its principal place of business with Metavine, Inc., in Scotts Valley, California.

## RELIEF DEFENDANT

20.     **Metavine Pty. Ltd.** is an Australian proprietary limited company based in Queensland, Australia, and is owned entirely by Metavine, Inc.  Metavine Pty. Ltd. has been

registered to conduct business in Australia under the names Metavine Australia and Crowd Machine.

## RELATED ENTITY

21.    **Crowd Machine SEZC** is a Cayman Islands special economic zone company that is owned entirely by Metavine, Inc.  Crowd Machine SEZC is no longer operational and is currently subject to voluntary liquidation proceedings under Cayman Islands law under the control of independent, third-party liquidators.

## FACTUAL ALLEGATIONS

### A.  Background on Digital Tokens

22.    An "initial coin offering" or "ICO" is a fundraising event in which unique digital "coins" or "tokens" like CMCTs are offered and sold in exchange for consideration (often in the form of virtual currency—most commonly Bitcoin and Ether—or fiat currency, such as U.S. dollars).  The tokens are issued and distributed on a "blockchain,"[1] and may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.

23.    ICOs are typically announced and promoted through public online channels and promotional events and conferences.  To participate, investors are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account.

24.    At some point after the completion of the ICO, the issuer will distribute the tokens to the participant's unique "wallet" address on the blockchain.  Tokens are sometimes transferred

---

[1]    A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain.  The system relies on cryptographic techniques for securely recording transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  Some blockchains can record what are called "smart contracts," which are, essentially, computer programs designed to execute the terms of a contract when certain triggering conditions are met.

between users, and may also be "listed" on online digital asset trading platforms, popularly known as virtual currency, cryptocurrency, or "crypto" exchanges, which facilitate secondary market transactions in which the tokens may be traded for other digital assets or bought with and sold for fiat currencies.

**B.  Defendants' Offer and Sale of CMCT Tokens**

25.     Established in 2013 by Sproule, Metavine, Inc. is a technology company that developed and distributed "zero-code" software intended to enable customers without computer coding experience to assemble custom computer applications using preexisting components.

26.     In late-2017 and early-2018, Sproule established two new companies—Crowd Machine SEZC and Crowd Machine, Inc., respectively—solely for the purpose of conducting an initial coin offer.  These new companies were owned entirely by, and operated as divisions of, Metavine, Inc., with no separate offices or employees, and employees of all three entities held themselves out as working for what they themselves referred to as the "Crowd Machine Group" (or "CMG") without drawing any distinctions between the three legal entities.

27.     In November 2017, Defendants began marketing the initial coin offering of Crowd Machine Compute Tokens or CMCTs as an effort to fund the creation and development of a new technology—a decentralized "Crowd Computer"—to host Metavine's zero-code software and promote the development and exchange of software components using blockchain technology.

28.     At all relevant times, defendants Metavine, Inc., Crowd Machine, Inc., and Crowd Machine SEZC did business under the umbrella name "Crowd Machine," and Defendants drew no substantive distinction between actions undertaken on behalf of Metavine, Inc., Crowd Machine, Inc., and/or Crowd Machine SEZC in connection with the CMCT ICO.

29.     Defendants used CMG's website, hosted within the United States and accessible at http://www.crowdmachine.com to internet users worldwide (including user in the United States), to promote the CMCT ICO and distribute information and documentation to prospective investors.

30.     Every page on CMG's website and nearly every document made available through this website displayed the same logo, copied below, which consisted of a multicolored circular design adjacent to "Crowd Machine" in stylized text, without reference to any specific legal entity or actual corporate name.



31.     The "Terms of Use" and "Privacy Policy" pages on CMG's website began with the following definition:  "Crowd Machine SEZC, Crowd Machine, Inc., and Metavine, Inc. (collectively 'Crowd Machine', 'we', 'us' or 'our')," leaving no doubt that all three entities were operated jointly and did business under the general name, "Crowd Machine."

32.     The more conversational "Frequently Asked Questions" page on CMG's website emphasized this point by including the following question, without any reference to the actual legal names of the underlying entities: "Why is the name of the company Crowd Machine?"  In response, CMG's website stated, "The name reflects our commitment to enabling everyone in the world, regardless of their location, to be rewarded for their participation in the decentralized app economy."

33.     As such, all relevant conduct of CMG personnel, including Sproule—who directed and controlled all of CMG's activities—was undertaken on behalf of, and attributable to, Crowd Machine, Inc., Crowd Machine SEZC, and Metavine, Inc., without distinction, doing business as "Crowd Machine."

34.     According to "white papers" first posted to CMG's website in November 2017 and authored by Sproule to "outline[] the current and future developments of Metavine. Inc." and solicit ICO investors, the "Crowd Computer," as conceived, would solve two problems: "The need for software apps is outpacing their creation, while at the same time, device memory and processor capacity remains largely underutilized."

35.     As marketed to investors, CMCTs would be used within the "Crowd Machine Ecosystem" to reward "device owners participating on the Crowd Computer . . . each time their

devices' computing resources are utilized to run app content, as well as software "developers who place Patterns or apps into Crowd Share . . . each time that content is executed on the Crowd Computer."

36.     Although Metavine's zero-code software was operational and in use at the time of the ICO, it was hosted on centralized servers and users relied on application building blocks developed and made available by Metavine, Inc.  The decentralized "Crowd Computer," which would purportedly incentivize the creation and exchange of new application components by allowing contributors to earn CMCTs, did not exist and, therefore, CMCTs had no use at the time they were offered.

37.     Defendants also marketed the CMCT ICO through messaging applications, like Telegram, and on social media platforms hosted in and accessible to users in the United States, including Facebook, Twitter, Medium, and YouTube.

38.     A running list of all social media platforms Defendants used to market the CMCT ICO was compiled by CMG personnel and regularly broadcast to all members of the "Official Crowd Machine Telegram Group."

39.     This social media list was also "pinned" within the Telegram channel to keep it readily accessible to interested parties.  Copied below is a Telegram post by one of CMG's

*SEC v. Crowd Machine, Inc., et al.*
COMPLAINT

authorized Telegram administrators using the Telegram username "Crowd Machine," with an example of this social media list from December 6, 2017.



40.     CMG personnel, including Sproule, also participated in and hosted live in-person events in the United States, as well as live-streamed "webinars" to promote the CMCT ICO and generate interest in the underlying technology.

41.     As described in the white papers, the CMCT ICO would be held in two phases. Between January 28 and April 20, 2018, in what Defendants called a "private presale" (hereinafter, the "First Phase"), CMG and Sproule would offer CMCTs through "Simple Agreements for Future Tokens" ("SAFTs").  These SAFTs, which Defendants have acknowledged were investment contracts, entitled investors to an unspecified allotment of CMCTs, once issued, in exchange for the a payment of Ether, Bitcoin, or U.S. dollars.

42.     Pursuant to the terms of the SAFTs they executed, First Phase investors would receive their token allotments once tokens were distributed to the general public, with the amount of their allotment to be determined based on an "exchange rate" or token valuation to be determined twenty days after public token distribution.

10

43.     Notably, First Phase investors were allocated "bonus" CMCTs, calculated as a percentage of their total purchase, which ranged from 100% to 400% based on the date of their investment.  In other words, investors who executed SAFTs early enough to receive a 400% bonus were promised four additional CMCTs for every one CMCT they paid for.  These bonuses effectively slashed the per-token price paid by First Phase investors as compared with the price paid by later purchasers.

44.     At the same time, between April 1 and April 20, 2018, CMG and Sproule also began offering and selling CMCTs on less favorable terms in what they called a "public presale" (hereinafter, the "Second Phase").

45.     Purchasers in the Second Phase did not execute SAFTs, and those who purchased tokens within the first ten days received a bonus, which, at 50%, was significantly lower than the bonuses awarded to First Phase purchasers.  Thus, Second Phase investors paid up to five times the price for each CMCT as did early First Phase investors.

46.     In an apparent effort to avoid or circumvent the registration requirements of the federal securities laws, Defendants claimed publicly that the First Phase of the ICO was limited to foreign investors and accredited investors in the United States.  Defendants also claimed publicly that participation in the First Phase required a minimum investment of $100,000.  In reality, neither of these claims were true.

47.     To secure the bonuses offered to First Phase investors, groups of investors— known in the digital asset community as "ICO Pools"—pooled resources to meet the $100,000 threshold and transferred them to accredited investors who then purchased CMCTs on their behalf in the First Phase of the ICO.

48.     These ICO pools included U.S. investors, who were not required to and did not verify their identities or establish their accredited status before investing in the ICO.

49.     Defendants were aware that investors representing ICO Pools purchased CMCTs in the First Phase of the ICO on behalf of their underlying investors, but did not require or even request documentation to ascertain or confirm the underlying investors' identities or their

accredited status.  In some instances, CMG employees and agents knowingly solicited and facilitated investments by these ICO pools.

50.     In fact, Sproule himself served as the representative of at least two ICO Pools, and as such, he collected funds, executed SAFTs, and received CMCTs on behalf of the individual investors, to whom he subsequently distributed them.  Neither Sproule nor other CMG employees or agents required or requested from the underlying investors in these ICO Pools documentation to ascertain or confirm their identities or accredited status.  Instead, Sproule provided CMG only with an image of his passport to prove his own identity and documents establishing his own accredited status.

51.     In the Second Phase, neither CMG nor Sproule purported to limit participation to accredited investors, and they made no public statements even suggesting that U.S. investors were to be excluded.  In fact, CMG personnel repeatedly wrote in CMG's Telegram channel that U.S. investors could participate in Phase 2 of the ICO, regardless of accredited status.

52.     In total, Defendants claimed to have raised the equivalent of USD $40.7 million through the sale of CMCTs to over 900 investors ICO, nearly all of which came from First Phase participants.

53.     In addition, $7.25 million of the proceeds CMG purportedly raised during the ICO was attributed to a single purchase—by far, the largest single purchase by any ICO investor—by a Malaysian gold mining company, but only $250,000 was actually collected from this purchaser. The remaining $7.25 million, which CMG appears to have extended to the purchaser in credit, was never received, and the corresponding CMCTs were never distributed.

54.     Thus, actual proceeds from CMCT sales appear to have been less than the $40.7 million that CMG and Sproule claimed to have raised.  Based on the market values of ETH and BTC at the time of the ICO, CMG actually collected the equivalent of only USD $33.5 million.

### C. Purchasers Had a Reasonable Expectation of Future Profits Derived From the Entrepreneurial Efforts of CMG and Sproule

55.     Defendants' offering materials, including two versions of a document titled "Crowd Machine Compute Token ('CMCT') Sale Structure" aimed at First Phase and Second Phase investors, represented that ICO proceeds would be used for "[s]ustaining engineering and feature enhancement of the [Crowd Computer technology], [Development of a global developer community, [s]ales and marketing, [p]roduct and community support, [and[ [o]ther normal business functions, and was accompanied by the following graphic:



56.     In these and other documents, Defendants emphasized that the "success of the project" was dependent on the "sales and marketing" efforts of CMG's management and employees to "establish[] a recognized brand to engender global community participation" and "promote the project and product consumption," which would increase demand for CMCTs.

57.     CMG explicitly compared its project to Amazon Web Services and Microsoft Azure, and then projected the future value of CMCTs based on Amazon Web Services' success, stating the token could be worth anywhere from $10-$600 per token "excluding the speculative pricing of CMCTs on secondary markets" and "$295/CMCT" was the "target price at full

utilization of the network.  In contrast, most investors who purchased CMCTs in the ICO paid the equivalent of between $0.03 and $0.22 per token (accounting for any bonus tokens awarded), and the trading price of CMCTs on secondary digital asset trading platforms never exceeded $0.18 per token.

58.    CMG and Sproule represented throughout the offering that CMG would work to develop and promote its "community" as well as its technology.  They made several statements linking the success of the ICO to the development of CMG's technology and underlying community and touted on its website the qualifications of the management team undertaking these efforts.

59.    In offering materials, CMG stated that it would create "Crowd Machine centers of excellence" to "promote the Crowd Machine brand," which, it stated, would lead to "the successful adoption of [the Crowd Machine] technology."

60.    In one Facebook post promoting the ICO, CMG wrote, "[i]ts [sic] important to know WHO you are investing in when you invest in a product.  Meet Craig Sproule - the man behind the Machine."  CMG included a link to Sproule's biography, touting his 30 years of technical experience.

61.    In addition, Defendants deliberately capped the total amount of CMCTs, which they claimed would create a "reservation demand for investment (speculation)" that could cause the token to "appreciate significantly."

62.    To enable investors to profit from such appreciation, CMG also promised that it would work to create a secondary market for trading in CMCTs.  In an interview posted on YouTube during the offering, Sproule stated that "we expect" the token to be listed on "secondary exchanges."  CMG and Sproule also stated in Offering Documents that it had to be "cautious" due to "regulatory restrictions surrounding solicitation to exchanges," but confirmed CMG's "intent is to use listing on regulatory secondary marketplaces" for CMCTs.  CMG further acknowledged that First Phase participants expected "the relevant liquidity to exit their position in CMT [sic]" and "SAFT investors provide investment (as a security) for the purpose of obtaining a significant ROI."

63.     CMG also enticed investors by misleadingly touting the already-successful development the project's underlying technology as indicative of future success.  In offering materials and on social media, CMG claimed that its technology had been "battle tested" by "Fortune 500 companies" including GE and Anthem.  In a newsletter sent to prospective investors, CMG wrote that "ICO's [sic] for companies who don't have a product yet are all about financial speculation – investing in an idea."  "In contrast," Crowd Machine claimed to "have a live, commercial product that we really want our loyal users and community members to be able to invest in."

64.     In reality, none of the technology related to the Crowd Computer was functional, and the only technology that had been "battle tested" by any third parties was Metavine, Inc.'s existing application development software

65.     Based on these statements, it is no surprise that many investors who purchased CMCTs in the ICO did so primarily because they hoped that the tokens would appreciate, and they felt confident that they would profit both because of CMG's representations regarding the state of its existing technology in use by Fortune 500 companies, as well as promises that experienced management would undertake to build the Crowd Computer community, increase demand for CMCTs, list CMCTs on secondary markets, and work towards realizing investors' expectation of a "significant ROI."

66.     The "Crowd Computer" platform was, after all, expected to be the only place that CMCTs could be used.  Yet despite raising millions from CMCT purchasers to develop this platform, CMG never ultimately operationalized its "crowd computer," and thus CMCT holders have never been able to use the tokens for any purpose.

### D.  Defendants' Offers and Sales of CMCTs were Illegal Unregistered Offers and Sales of Securities

67.     The CMCT offering was an offer and sale of "securities" as defined by Section 2(a)(1) of the Securities Act because it constituted the offer and sale of investment contracts.

68.     As detailed above, Defendants offered and sold CMCTs as part of a general solicitation that included investors in the United States, and took no steps to ascertain or verify

the accredited status of U.S. persons who invested as part of ICO pools or in the Second Phase of the offering.  Investors, including U.S. investors, purchased their CMCTs in exchange for value, by transferring to CMG either U.S. dollars or digital assets like ETH or BTC.

69.     Also as detailed above, CMCT purchasers bought into a common enterprise—the Crowd Machine "community"—and from their investment in the Crowd Machine ecosystem. CMG and Sproule represented that they would use the proceeds of the CMCT offering to build an ecosystem that would create demand for CMCTs, which CMG and Sproule said would increase their value.

70.     As shown above, CMG and Sproule made numerous statements that gave rise to token purchasers' reasonable expectation that they would profit from the success of CMG's efforts to develop the ecosystem and related rise in the value of CMCTs.

71.     Investors' profits were to be derived from the significant entrepreneurial and managerial efforts of others—specifically Sproule, CMG, and their agents—who were to create the ecosystem that would increase the value of CMCTs and facilitate secondary market trading.

72.     The CMCT offering was structured to encourage speculative purchases, as the tokens had no use at the time of the offering.  Indeed, investors' expectations were validated by CMG's and Sproule's statements on social media and Internet forums, where both described how the demand created by the Crowd Machine ecosystem combined with the scarcity of the CMCTs would increase the value of the tokens.

73.     Each defendant directly and/or indirectly offered and sold CMCTs, engaged in steps necessary to the public distribution of the CMCT, and was a necessary participant in the offering of CMCTs.

74.     Absent an applicable exemption, the Securities Act prohibited Defendants from offering or selling CMCTs without first registering them with the SEC.

75.     At the time of ICO, no registration statement had been filed as to the sale of CMCTs tokens, and no registration statement was in effect as to the sale of those tokens.

76.     Defendants offered and sold CMCTs tokens without any exemption from the registration requirement.

*SEC v. Crowd Machine, Inc., et al.*
COMPLAINT

### E.  Defendants Made Material Misrepresentations about their Use of ICO Proceeds

77.  During and in connection with the unregistered offer and sale of CMCT tokens, Defendants Sproule, along with Metavine, Inc. and Crowd Machine, Inc., through Sproule and other CMG personnel, made a number of materially false and misleading statements to potential and actual investors.

78.  Contrary to CMG's representations, CMG—at Sproule's direction—allocated a significant portion of the ICO proceeds to endeavors that were entirely unrelated to the development and marketing of the Crowd Computer technology, the creation of an ecosystem in which CMCTs could be used, or even efforts to increase demand for CMCTs to promote trading on secondary markets.

79.  For example, in April 2018 just as investors were transferring significant sums to CMG's digital asset wallets, CMG began transferring at least $5.8 million to foreign gold mining companies, predominantly in South Africa.

80.  CMG and the receiving parties treated some of these payments as loans, with the principal to be repaid over time, with interest.  To date, almost none of the funds have been repaid.

81.  Other payments were made for the purpose of securing for Metavine, Inc., Crowd Machine, Inc., and Crowd Machine SEZC equity interests in South African gold mining operations.  To date, these investments have failed to produce for CMG any revenue, and efforts to sell or otherwise monetize these interests have failed.

82.  At no point had CMG or Sproule ever disclosed that it intended to pay ICO proceeds to foreign gold mining entities for any reason, and this information would have been material to ICO investors' decisions about whether to purchase CMCTs.

### F.  Defendants Obtained Money and Property, and Relief Defendant Received Ill-Gotten Gains, as a Result of Defendants' Violations

83.  Defendants obtained money or property as a result of their untrue and misleading statements of material fact in their offer and sale of CMCT tokens.

84.     Metavine, Inc., Crowd Machine, Inc., and Crowd Machine SEZC, collectively, received Ether, Bitcoin, and U.S. currency totaling more than $33.5 million from CMTC investors in the ICO.

85.     These funds were paid by investors to digital asset wallets and bank accounts under the joint control of Metavine, Inc., Crowd Machine, Inc., and Crowd Machine SEZC.

86.     At all relevant times, Sproule exercised exclusive control over these ICO proceeds.

87.     All three of these entities routinely commingled assets and jointly utilized the same bank accounts in the course of their regular operations, and no clear delineations were made as to the ownership of the ICO proceeds.

88.     In addition, funds were routinely transferred among and between bank accounts in the name of these entities, as well as accounts in the name of Relief Defendant Metavine Pty. Ltd. depending on the distribution of funds between these affiliates at any given time.

89.     During and after the ICO, Relief Defendant Metavine Pty. Ltd. received at least thirty separate funds transfers from Metavine, Inc., Crowd Machine, Inc., and/or Crowd Machine SEZC, totaling at least $5 million.  These funds necessarily included ill-gotten gains from the fraudulent and unregistered ICO, as the total amount received greatly exceeded what could reasonably be attributed to Metavine Pty. Ltd.'s earned revenue.  Accordingly, Metavine Pty. Ltd received illegally obtained funds but has no legitimate claim to them.

## FIRST CLAIM FOR RELIEF

### Violation of Sections 5(a) and 5(c) of the Securities Act
### (All Defendants)

90.     The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 89, inclusive, as if they were fully set forth herein.

91.     The U.S. securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.

92.     For the reasons detailed above, the CMTCs were securities, no registration statement was in effect as to the CMTCs, and no exemption from registration applied.

18

93.     By the conduct described above, Defendants, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed

94.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, violated, and unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].  By engaging in the conduct described above, defendants offered and sold securities without a registration statement in effect and without an exemption from the registration requirement.

## SECOND CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act
### (All Defendants)

95.     The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 89, inclusive, as if they were fully set forth herein.

96.     By the conduct described above, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser

97.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Securities Act Section 17(a) [15 U.S.C. §77q(a)].

## THIRD CLAIM FOR RELIEF

**Violation of Section 10(b) of the Securities Act and Rule 10b-5 Thereunder
(All Defendants)**

98.     The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 89, inclusive, as if they were fully set forth herein.

99.     By the conduct described above, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made,  not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

100.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from violating Sections 5 and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

### II.

Permanently restraining and enjoining Defendants from participating, directly or indirectly, including, but not limited to, through any entity controlled by them, in any offering of securities, including any digital asset security, provided, however, that such injunction shall not

1   prevent Sproule from purchasing or selling securities, including any digital asset security, for his

2   own personal account;

3                                         **III.**

4       Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act

5   [15 U.S.C. § 77t(d)]; and

6                                         **IV.**

7       Ordering Defendants Crowd Machine, Inc. and Metavine, Inc, and Relief Defendant

8   Metavine Pty. Ltd., to disgorge all ill-gotten gains or unjust enrichment derived from the

9   activities set forth in this Complaint, together with prejudgment interest thereon;

10                                        **V.**

11      Prohibiting Sproule from acting as an officer or director of any public company; and

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.

Ordering Defendants to permanently disable all CMCTs in their possession or control, publish notice of the judgment on their websites and social media channels, in a form not unacceptable to Commission staff, and issue requests to remove CMCTs from any further trading on all digital asset trading platforms where CMCTs are or may be trading, including any that they previously contacted to request trading of CMCTs, and publish notice of such requests on their websites and social media channels.

Dated:  January 6, 2022                                  Respectfully submitted,


                                                      /s/ Adam B. Gottlieb
                                        Adam B. Gottlieb (New York Bar No. 4399135)
                                        gottlieba@sec.gov
                                        (202) 551-8299

                                        Attorney for Plaintiff
                                        U.S. Securities and Exchange Commission
                                        Division of Enforcement
                                        100 F Street, NE
                                        Washington, DC 20549
                                        Facsimile:  (301) 847-4705

Of Counsel:

Paul Kim
Laura D'Allaird
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

*SEC v. Crowd Machine, Inc., et al.*
COMPLAINT