UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>CROWD MACHINE, INC., METAVINE, INC., and CRAIG DEREL SPROULE<br><br>    Defendants,<br><br>and<br><br>METAVINE PTY. LTD.,<br><br>    Relief Defendant. | Case No. 4:22-cv-0076-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR MONETARY RELIEF**<br><br>Re: Dkt. No. 40 |

Pending before the Court is Plaintiff U.S. Securities and Exchange Commission's Motion for disgorgement against Defendants Crowd Machine, Inc., Metavine, Inc., and Craig Sproule and Relief Defendant Metavine Pty. Ltd., and civil penalties against Defendants Crowd Machine, Inc. and Metavine, Inc. Dkt. No. 40 ("Mot."). Defendants oppose the Motion. Dkt. No. 52 ("Opp."). The Court orders Defendants Crowd Machine, Inc., Metavine, Inc., and Craig Sproule and Relief Defendant Metavine Pty. Ltd. to pay the amounts detailed in this Order.

**I. BACKGROUND[1]**

In 2013, Craig Sproule founded Metavine, Inc., a technology company that developed and distributed "zero-code" software intended to enable customers without computer coding

---

[1] Defendants and Relief Defendant executed consents in which they each agreed that "the allegations of the Complaint shall be accepted as and deemed true by the Court," for purposes of the Commission's motion for disgorgement and/or penalties. *See* Dkt No. 2 at 2; Dkt. No. 3 at 2.

experience to assemble custom computer applications using preexisting components. Dkt. No. 1 ("Compl.") ¶ 25. In 2018, Sproule established two new companies, Crowd Machine SEZC and Crowd Machine, Inc., with plans to build a "Crowd Computer" that would host Metavine's zero-code software and promote the development and exchange of software components using blockchain technology. *Id.* ¶¶ 26–27. Between January and April 2018, defendant Craig Sproule, Metavine, Inc., Crowd Machine, Inc. and Crowd Machine SEZC raised more than $33 million from hundreds of investors in the United States and abroad through a fraudulent and unregistered "initial coin offering" or "ICO" of digital asset securities, which they called "Crowd Machine Compute Tokens" or "CMCTs." *Id.* ¶¶ 2. Defendants represented that ICO proceeds would be used to fund the development of a "global decentralized" peer-to-peer network, or "Crowd Computer." Defendants claimed this Crowd Computer would run their existing "no-code" application-development software from a network of users' own devices instead of traditional centralized servers. *Id.* Defendants further represented that users could compensate device owners with CMCTs for the use of their surplus processing power. *Id.* Users also could pay software developers in CMCTs for making available source code that users could compile into custom applications "with unparalleled speed." *Id.*

In November 2017, Defendants began marketing the initial coin offering. *Id.* ¶ 27. Although Metavine's zero-code software was operational and in use at the time of the ICO, the "Crowd Computer" did not exist and, therefore, CMCTs had no use at the time they were offered. *Id.* In marketing this ICO, Defendants enticed investors with misleading statements. *Id.* ¶ 63. For example, in offering materials and on social media, Defendants claimed that its technology had been "battle tested" by "Fortune 500 companies" including GE and Anthem. *Id.* In a newsletter sent to prospective investors, Defendants wrote that "ICO's [sic] for companies who don't have a product yet are all about financial speculation – investing in an idea." *Id.* "In contrast," Defendants claimed to "have a live, commercial product that we really want our loyal users and community members to be able to invest in." *Id.* In reality, none of the technology related to the Crowd Computer was functional, and the only technology that had been "battle tested" by any third parties was Metavine, Inc.'s existing application development software. *Id.* ¶ 64. The

complaint alleges that many investors who purchased CMCTs in the ICO did so "primarily because they hoped that the tokens would appreciate" and they "felt confident that they would profit both because of CMG's representations regarding the state of its existing technology in use by Fortune 500 companies, as well as promises that experienced management would undertake to build the Crowd Computer community, increase demand for CMCTs, list CMCTs on secondary markets, and work towards realizing investors' expectation of a 'significant ROI.'" *Id.* ¶ 65.

The CMCT ICO was held in two phases. *Id.* ¶ 41. Between January 28 and April 20, 2018, in what Defendants called a "private presale" (the "First Phase"), Defendants would offer CMCTs through "Simple Agreements for Future Tokens" ("SAFTs"). *Id.* These SAFTs, which Defendants have acknowledged were investment contracts, entitled investors to an unspecified allotment of CMCTs in exchange for a payment of Ether, Bitcoin, or U.S. dollars. *Id.*

Defendants claimed publicly that the First Phase of the ICO was limited to foreign investors and accredited investors in the United States with a required minimum investment of $100,000. *Id.* ¶ 46. According to the complaint, neither of these claims were true. *Id.* To secure the bonuses offered to First Phase investors, groups of investors—known in the digital asset community as "ICO Pools"—pooled resources to meet the $100,000 threshold and transferred them to accredited investors who then purchased CMCTs on their behalf. *Id.* ¶ 47. These ICO pools included U.S. investors who were not required to and did not verify their identities or establish their accredited status before investing in the ICO. *Id.* ¶ 48. Defendants were aware that investors representing ICO Pools purchased CMCTs in the First Phase of the ICO on behalf of their underlying investors, but did not request documentation to ascertain the underlying investors' identities or their accredited status. *Id.* ¶ 49. In some instances, Defendants' employees and agents knowingly solicited and facilitated investments by these ICO Pools. *Id.*

In the Second Phase of the ICO, Defendants did not purport to limit participation to accredited investors, and they made no public statements even suggesting that U.S. investors were to be excluded. *Id.* ¶ 51. In fact, Defendants repeatedly wrote in their Telegram channel that U.S. investors could participate in this phase of the ICO regardless of accredited status. *Id.* ¶¶ 52–54.

In total, Defendants claimed to have raised the equivalent of USD $40.7 million through

the sale of CMCTs to over 900 investors. *Id.* ¶ 52. Based on the market values of ETH and BTC at the time of the ICO, Defendants actually collected the equivalent of only USD $33.5 million after accounting for $7.25 million in offering proceeds that Defendants failed to collect. *Id.* ¶ 53.

Contrary to Defendants' representations, they allocated a significant portion of the ICO proceeds to endeavors that were entirely unrelated to the development and marketing of the Crowd Computer technology, the creation of an ecosystem in which CMCTs could be used, or efforts to increase demand for CMCTs to promote trading on secondary markets. *Id.* ¶ 78. For example, Defendants transferred at least $5.8 million to foreign gold mining companies, predominantly in South Africa. *Id.* ¶ 79. At no point had Defendants disclosed that it intended to pay ICO proceeds to foreign gold mining entities for any reason, and this information would have been material to ICO investors' decisions about whether to purchase CMCTs. *Id.* ¶ 82.

## II. PROCEDURAL HISTORY

The SEC filed its complaint in this matter on January 6, 2022. Dkt. No. 1. On January 11, 2022, with Defendants' consent, the Court entered judgment against Defendants for violations of Section 10(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 thereunder (177 C.F.R. § 240.10b-5); Section 17(a) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77q(a)); and Section 5 of the Securities Act (15 U.S.C. § 77e). *See* Dkt No. 11. In the Judgment, the Court ordered Defendants and Relief Defendant to pay, on a joint and several basis, disgorgement of ill-gotten gains and prejudgment interest thereon.

As part of the Judgment, the Court ordered that "in connection with the Commission's motion for disgorgement and/or civil penalties . . . solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court." *Id.* at 5. The Court has already ordered that "in connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendants and Relief Defendant will be precluded from arguing that Defendants did not violate the federal securities laws as alleged in the Complaint." *Id.* at 4−5.

## III. ANALYSIS

In its Motion, the SEC seeks to disgorge the full amount Defendants raised in the token

4

sale, or in the alternative, the full amount raised minus certain operational expenses. The SEC also seeks a maximum statutory penalty from each of Crowd Machine, Inc. and Metavine, Inc.

The SEC relies upon the Declaration of Avron M. Elbaum, an Assistant Chief Accountant in the Division of Enforcement and a Certified Public Accountant. *See* Dkt. No. 41-6. The underlying evidence upon which his summaries are based are the Defendants' own financial records and the Updated Token Sale Profit and Loss Spreadsheet prepared by Defendants for purposes of this litigation. *See* Mot. 10. Mr. Elbaum grouped the Defendants' claimed expenses into different categories, which the Court will adopt for ease of analysis. *Id.* Defendants claim to have incurred $37,168,882.74 in legitimate business expenses associated with the Crowd Machine project through April 30, 2021. *See* Mot. 12.

### A. Disgorgement

#### I. Legal Standard

The SEC bears the "burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citing *First Pac. Bancorp*, 142 F.3d at 1191). Once the SEC has met its burden, the burden shifts to the defendant to show that the figure is not a reasonable approximation. *Id.* Disgorgement typically includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct. *See SEC v. Cross Fin. Servs., Inc.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995).

The Supreme Court's recent decision in *Liu v. SEC*, 140 S. Ct. 1936, 1945, 207 L. Ed. 2d 401 (2020), departed from the Ninth Circuit's prior disgorgement precedent in recognizing that such awards are limited to the net profits from a defendant's wrongdoing, defined as "the gain made upon any business or investment, when both the receipts and payments are taken into the account." In the Court's view, a rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Id.* (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146 (1888)). "[W]hen the entire profit of a business or undertaking results from the wrongful activity," then "the defendant will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." *Liu*, 140 S. Ct. at 1945. That

5

exception, in turn, requires the court to ascertain whether expenses are legitimate or whether they are merely wrongful gains "under another name," with the aim of preventing defendants from profiting from their own wrongdoing.  *Id.*  The Court did not provide guidance as to when a defendant's expenses "might be considered wholly fraudulent," but noted that  "some expenses from petitioners' scheme went toward lease payments and cancer-treatment equipment" that "arguably have value independent of fueling a fraudulent scheme." *Id.*  On remand, the district court observed that the scheme appeared entirely fraudulent, but, acting "out of an abundance of caution," found administrative fees and costs for the construction of a cancer treatment center consistent with their advertised business model to be deductible. *SEC v. Liu*, No. SACV1600974CJCAGRX, 2021 WL 2374248, at *6 (C.D. Cal. June 7, 2021), *aff'd sub nom. SEC v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022), *cert. denied sub nom. Liu v. SEC*, 143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023).

The Ninth Circuit has applied this new framework in *SEC v. Russell*, No. 22-55093, 2023 WL 4946603 (9th Cir. Aug. 3, 2023), and *SEC v. Yang,* No. 21-55437, 2022 WL 3278995 (9th Cir. Aug. 11, 2022).[2]  In *Russell*, the defendants derived their gross proceeds by "deceiv[ing] [investors], often in elaborate fashion, into believing that they were buying shares in a fast-growing cannabis business" that never got off the ground and was likely a sham.  2023 WL 4946603 at *2 (9th Cir. Aug. 3, 2023).  The Ninth Circuit noted that because Russell's "entire profit resulted from" securities fraud, the district court was not required to deduct *any* of Russell's business expenses from his improperly derived investor funds.  *Id.*  The Ninth Circuit nevertheless affirmed the district court's decision to deduct what it found to be legitimate business expenses and only disgorge the funds spent on a yacht purchase, finding this figure to serve as a "reasonable approximation" of the defendant's ill-gotten gains.  *Id.*  Similarly, in *Yang*, the Ninth Circuit affirmed a deduction of $1,000,000 used to pay back construction-related debt as a legitimate

---

[2] As unpublished Ninth Circuit decisions, *Russell* and *Yang* are not precedent, but may be considered for their persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

6

expense, while disgorging $1,414,250 of investors' funds that Defendant used to pay back personal loans. 2022 WL 3278995 (9th Cir. Aug. 11, 2022)

## II. Analysis

Taking all allegations in the complaint as true, Defendants received $33,499,206.21 from the ICO token sale. The SEC deems this entire token sale fraudulent, noting that Defendants misrepresented the state of the technology and failed to notify investors about its eventual use of funds, which included a $5.8 million loan to a gold mining operation. Compl. ¶¶ 1–9. The SEC argues that because all of Defendants' gross revenue derived from this fraudulent sale, no deductions are warranted. Alternatively, recognizing the Court's equitable discretion, the SEC points to $13,748,904.94 in expenses that are "not clearly connected to the fraudulent scheme" that the Court potentially could deduct. Mot. 20. The SEC rejects Defendants' claim that marketing, consulting, and legal expenses related in any way to the sale should be deducted.

Following the principles established in in *Liu*, *Russell*, and *Yang*, the Court notes that it appears undisputed that Defendants' business was not a complete sham. Although Defendants derived nearly $33.5 million from an unregistered token sale infected by fraud, the business otherwise incurred significant operating expenses that did not "fuel" or "further" the token sale. *Russell*, 2023 WL 4946603, at *1 (quoting *Liu*, 140 S. Ct. at 1950).

At the outset, Defendants contend that disgorgement is not appropriate because they did not profit from the scheme. The Ninth Circuit has rejected this argument. *See SEC v. Liu*, No. 21-56090, 2022 WL 3645063, at *2 (9th Cir. Aug. 24, 2022), *cert. denied sub nom. Liu v. SEC*, 143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023) ("Appellants make this very argument: No net profit, thus no disgorgement. Clearly, this outcome would not produce an equitable remedy for Appellants' fraud."). But deductions of legitimate operating expenses are appropriate in this case. As explained below, the Court deducts (1) certain expenses the SEC itself does not specifically deem to be illegitimate; and (2) certain legal fees.[3]

---

[3] Defendants concede that the $5.8 million sent to a gold mining entity is not a legitimate expense to deduct in this context. *See* Opp. 20.

7

### 1. Expenses Not Specifically Contested by the SEC

The SEC maintains that if this Court decides to make certain equitable deductions to the disgorgement amount, $13,748,904.94 in expenses can be characterized as "legitimate" and "not clearly connected to the fraudulent scheme." Mot. at 20. The Court therefore deducts this amount.

### 2. Marketing and Consulting Expenses

Defendants incurred various expenses in marketing the token sale and retaining consultants to advise on the sale. The SEC argues that costs incurred to initiate the unlawful and unregistered sale of securities, such as marketing and consulting costs to further the sale, do not have any value "independent of fueling a fraudulent scheme." *Liu*, 140 S. Ct. at 1950; *Russell*, 2023 WL 4946603 at *1 (expenses not deductible if "they were incurred for the purposes of furthering an entirely fraudulent scheme") (quoting *Liu*, 140 S. Ct. at 1950). The Court agrees. These expenses furthered an unregistered sale of securities that Defendants knew at the time to be subject to fraudulent misrepresentations. *See* Compl. ¶¶ 45−53, 63−64, 78, 79, 82; *see also SEC v. Fisher*, No. 21-60624-CIV, 2022 WL 13650848, at *4 (S.D. Fla. Oct. 21, 2022) ("Any funds spent in furtherance of drawing in more victims to [the] fraud are not, by any stretch of the imagination, legitimate business expenses."); *SEC v. Navellier & Assocs., Inc.*, No. 17-CV-11633-DJC, 2021 WL 5072975, at *7 (D. Mass. Sept. 21, 2021) ("Defendants' marketing expenses can also be seen as the reinvestment of profits in expanding the fraud, rather than as an actual expense of the business."), *SEC v. Owings Grp., LLC*, No. CV RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021) ("These expenses are not legitimate expenses to be deducted because they were used to solicit investors into the fraudulent scheme"), *aff'd sub nom. SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022). Accordingly, the Court will not deduct line items identified as "ICO marketing," "Token Sale Advertising," "Token Sale Public Relations," "Token Sale Trade Shows," "Token Sale Preparation Costs," and "Token Sale Consultant Costs."

### 3. Token Minting Expenses

Defendants claim that expenses related to minting tokens for the sale should be deducted as legitimate, pointing to case law deducting "transaction costs" such as brokerage fees incurred in

8

processing fraudulent transactions. Opp. 18 (citing *SEC v. Bronson*, 602 F. Supp. 3d 599, 617–18 (S.D.N.Y. 2022), *aff'd sub nom. SEC v. Bronson*, No. 22-1045-CV, 2022 WL 5237474 (2d Cir. Oct. 6, 2022), *cert. denied sub nom. Bronson v. SEC*, 143 S. Ct. 2643 (2023). But unlike brokerage expenses, the creation of these tokens was at the heart of the violations at issue: Defendants minted the tokens to sell in an unregistered offering that was itself infected by fraud. Costs to mint these tokens therefore should not be deducted.

### 4. Legal Fees

Defendants also argue that four categories of legal fees should be deducted: (1) $520,066 spent litigating a token purchaser's claim against them; (2) $455,162 spent defending the SEC investigation; (3) $71,150 spent in "unspecified" legal expenses; and (4) $34,909 in legal fees attributed to the token sales. Opp. 18. The SEC contends that these fees conferred no value independent of the fraudulent scheme. Mot. 18.

As to the first two categories, the Court agrees with the SEC that fees related to defending against a private arbitration brought by an investor and this enforcement action—in other words, defending the fraud itself after the fact—would be inequitable to deduct. *See SEC v. Navellier & Assocs., Inc.,* No. 17-CV-11633-DJC, 2021 WL 5072975, at *7 (D. Mass. Sept. 21, 2021) ("As these legal expenses are unrelated to the [legitimate activities conducted on behalf of investors] they should not be deducted.").

As to third category of $71,150 of "unspecified" expenses, Defendants argue that the Memo/Description included with the Sale Profit and Loss Spreadsheet entries demonstrates that all but $2,750 of the $71,150 was paid to a law firm that counseled Defendants at the time of the token sale. Opp. 18. According to Defendants, this firm provided outside general counsel advice, which included advice on Form D filing as well as advice regarding whether the CMCTs were securities subject to SEC regulation. *Id*. The Court finds this expense to be legitimate. Holding otherwise would disincentivize good faith practices in seeking legal advice. Moreover, the Court notes that the offering materials explicitly earmarked a portion of the token sale receipts for legal expenses. Opp. 19. Investors understood that part of their investment would be spent on legal fees. *See Liu*, 2021 WL 2374248, at *6 (permitting the deduction of administrative fees, including

9

certain legal fees, because they were referenced in the private offering memorandum). The same holds true for the fourth category of $34,909 in legal expenses paid for legal advice related to the token sales. Opp. 19. For the $2,750 in fees not accounted for, the Court again notes that investors understood that their investment would defray certain legal fees. *Id.* In its discretion, the Court thus deducts this $2,750 from the amount subject to disgorgement.

### 5. Cryptocurrency Depreciation

Defendants received nearly $33.5 million in cryptocurrency from the ICO, but claim that the cryptocurrency depreciated in value by the time Defendants liquidated the assets. Opp. 13. Citing GAAP accounting principles, Defendants claim this depreciation should count as a deductible business expense. *Id.* The SEC responds that this depreciation is not a business expense at all. Mot. 14. The Court agrees with the SEC that such a loss does not amount to an expense. As noted, the Court could disgorge the full amount Defendants raised in the token sale because it was derived from fraud. Exercising caution based on *Liu*, the Court deducts expenses incurred by the business that did not further the fraudulent nature of the token sale. But treating depreciation of an asset class as a legitimate business is a step too far—let alone depreciation of assets *taken by fraud*. Depreciation of a volatile asset class does not fall within the same category as the reasonable and necessary expenses incurred in running a business as outlined in *Liu* and cases following it. And even if the Court characterized such a loss as covered by this "expense" category, depreciation more closely resembles a dissipation of assets due to improper management rather than an expense incurred in the regular course of business. Prior to *Liu*, courts allocated the risk of holding a volatile asset to the fraudster rather than to innocent investors by determining the value of the asset as of the day Defendants improperly acquired it. *See, e.g.*, *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1115-16 (9th Cir. 2006) (court may order disgorgement even if the violator "is no longer in possession of such funds due to subsequent, unsuccessful investments or other forms of discretionary spending"); *SEC v. Aletheia Rsch. & Mgmt. Inc.*, No. CV1210692JFWRZX, 2015 WL 13404306, at *3 (C.D. Cal. May 11, 2015), *aff'd sub nom. SEC v. Aletheia Rsch. Mgmt.*, 689 F. App'x 512 (9th Cir. 2017) ("mark-to-market embedded profit or loss at the end of the day of allocation is precisely the gain that Eichler obtained for himself (or family

10

members) as a result of his cherry-picking."); *In re L.C. Wegard & Co.*, SEC Release No. 34–40046, 67 S.E.C. 552, 1998 WL 275929 at *6 (May 29, 1998), *aff'd*, 189 F.3d 461 (2nd Cir. 1999) ("Disgorgement is an equitable remedy.  A manipulator is not relieved of its disgorgement obligation simply because it chooses, for whatever reason, to retain manipulated securities until their subsequent drop in price dissipates some or all of the manipulator's ill-gotten gains.").[4]  Stretching "legitimate expense" to include depreciation of an asset class taken by fraud necessarily would turn this longstanding principle on its head.  As such, the Court does not deduct this purported expense.

### 6. Accrued Expenses

Defendants claim that certain "accrued" expenses should also be deducted, arguing that that if they had not incurred a net loss, they would have had the funds to pay these salaries.  Opp. 20.  According to Defendants, an accrued expense is a real expense that affects Defendants' "actual profits" no differently than an expense that has already been paid.  The Court disagrees.  Disgorgement is properly based on Defendants' "actual profits."  *See Platforms Wireless Int'l Corp.*, 617 F.3d at 1096 ("Once the SEC establishes a reasonable approximation of defendants' actual profits" the burden shifts to the defendant to show it is not a reasonable approximation).  It does not appear that Defendants actually paid these expenses, so the $732,354.54 in accounting accruals cannot be properly deducted.

### 7. Disgorgement for Relief Defendant Metavine Pty. Ltd.

During and after the ICO, Relief Defendant Metavine Pty. Ltd. received at least thirty separate funds transfers from Metavine, Inc., Crowd Machine, Inc., and/or Crowd Machine SEZC, totaling at least $5 million.  Compl. ¶ 89.  The SEC seeks disgorgement on a joint and several basis from the Relief Defendant in the amount of investor money that it improperly received.  Mot. 21.  A court may order equitable relief against "a person who is not accused of wrongdoing

---

[4] *See also SEC v. Shapiro*, 494 F.2d 1301, 1309 (2nd Cir. 1974) ("To require disgorgement only of actual profits in cases where the price of the stock subsequently fell would create a heads-I-win, tails-you-lose opportunity for the violator: he could keep subsequent profits but not suffer subsequent losses."); *SEC v. Mannion*, 28 F. Supp. 3d 1304, 1308–09 (N.D. Ga. 2014) ("[E]very circuit that has addressed the issue has held that disgorgement is properly based on a defendant's unrealized 'paper' profits at the time of the illegal transaction.").

in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir.1998); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998); *SEC v. World Capital Market, Inc.*, 864 F.3d 996, 1003-04 (9th Cir. 2017).

The SEC argues that these funds necessarily included ill-gotten gains from the fraudulent and unregistered ICO, as the total amount received greatly exceeded what could reasonably be attributed to Metavine Pty. Ltd.'s earned revenue. Mot. 22. Defendants provide no rebuttal to this argument. Taking the allegations in the complaint as true, the Court infers that Relief Defendant received ill-gotten funds. *See* Compl. ¶ 89. The SEC is also correct that as between the investors and the Relief Defendant, the Relief Defendant has no legitimate claim to any of the investor funds. The holding in *Liu* that the SEC may not seek disgorgement "in excess of a defendant's net profits from wrongdoing," *Liu*, 140 S. Ct. at 1946, "simply has no bearing on the propriety of the judgment entered against [a relief defendant], which was not a defendant, was not accused of wrongdoing, and which was not required to disgorge 'profits,' gross or net." *SEC v. San Francisco Reg'l Ctr. LLC,* No. 17-CV-00223-RS, 2020 WL 4569844, at *2 (N.D. Cal. Aug. 7, 2020), *aff'd sub nom. SEC v. Berkeley Healthcare Dynamics, LLC,* No. 20-16754, 2022 WL 42807 (9th Cir. Jan. 5, 2022). Accordingly, the Court holds that Relief Defendant Metavine Pvt. Ltd. is liable to disgorge $5,000,000 in ill-gotten funds.

### B. Civil Penalties

The Court's judgment against Defendants Crowd Machine, Inc. and Metavine, Inc. provides that they shall pay a civil penalty. *See* Dkt. No. 11 at 4. Section 77t(d) provides for three tiers of penalties in this context. Tier I penalties are available for all violations, and the amount of the penalty "shall be determined by the Court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2). Tier II penalties require fraud, deceit, manipulation, or a deliberate or reckless disregard of regulatory requirements, and Tier III penalties require Tier II elements, plus substantial losses or significant risk of substantial losses to other persons. *Id.* The statutory tiers set forth the maximum penalties to be imposed, but the amount is left to the discretion of the court based on the particular facts of the case. *SEC v. Husain,* 70 F.4th 1173, 1184 (9th Cir. 2023). In deciding what

is an appropriate civil penalty in this context, courts frequently consider the factors set forth in *SEC v. Murphy,* 626 F.2d 633, 655 (9th Circuit 1980). These factors include: (1) the degree of defendant's scienter; (2) the isolated or recurrent nature of the infraction; (3) the likelihood that future violations might occur because of defendant's professional occupation; (4) the defendant's recognition of the wrongful nature of his conduct; (5) the sincerity of defendant's assurances against future violations; (6) the defendant's cooperation with authorities; (7) whether the defendant's conduct created substantial losses or the risk of losses to others; and (8) the defendant's ability to pay. *Id.*

The SEC requests a statutory maximum third-tier statutory penalty of $1,116,140 from each of Crowd Machine, Inc. and Metavine, Inc. The SEC notes that it makes this request in lieu of seeking Defendants' gross pecuniary gains of approximately $33.5 million. Dkt. No. 55 ("Reply") at 13. It also notes that it declined to seek separate statutory penalties for each of Defendants' wrongful acts, which include more than thirty separate wire transfers to South African gold-mining companies and multiple distinct misrepresentations to numerous investors in various offering documents. *Id.* The SEC maintains that this narrower set of penalties is appropriate because Defendants raised more than $33 million through a fraudulent and unregistered initial coin offering; knowingly misrepresented the status of the technology related to the Crowd Computer to derive these funds; and diverted investor funds to activities unrelated to those they marketed to investors. Mot. 24.

Defendants request at most a first-tier penalty of not more than $50,000, pointing to a number of extenuating factors. Opp. 22–25. First, Defendants argue that they made a good faith effort to understand the regulatory landscape in an emerging market. *Id.* 23. Second, they contend that the scope of the fraud surrounding the token sale was not a years' long, carefully orchestrated scheme fueled by repeated behavior. *Id.* Third, Defendants point out that they cooperated with the investigation and that they entered into a consent order when they learned the outcome of the investigation. *Id.* 23–24. Fourth, Defendants note that this is a first-time offense and that Defendants have no plans to participate in future ICOs. *Id.* Finally, Defendants contend that they cannot afford to pay a disgorgement award, let alone anything close to the third-tier penalty

amount the SEC seeks. *Id.* 25.

The Court finds that a third-tier penalty is appropriate because Defendants admit to fraudulent behavior and a deliberate (or at least reckless) disregard for regulatory requirements that resulted in substantial losses to investors. The Court applies the *Murphy* test to determine the appropriate dollar amount of the third-tier penalty.

The first, second, and seventh *Murphy* factors favor a sizable third-tier penalty. As to the first factor, scienter, Defendants admit to knowingly misrepresenting key facts related to the sale. The unregistered token sale presents a more difficult scienter question: the SEC issued guidance urging cryptocurrency sellers to ensure compliance with securities laws, *see* Reply 12, but this guidance did not definitively establish which digital assets qualified as securities. Although Defendants were on notice of the potential consequences of an unregistered sale, the Court notes that Defendants conducted the sale after consulting with counsel, who advised that CMCTs likely were not subject to registration as securities, *see* Opp. 4. These facts somewhat mitigate wrongful intent. As to the second factor, the recurrent nature of the infraction, Defendants' wrongdoing was cabined to the activity surrounding the token offering, but Defendants nevertheless admit to many separate fraudulent acts over an extended period of time. And as to the seventh factor, Defendants caused investors to lose substantial sums—nearly $33.5 million.

The remaining *Murphy* factors favor a lesser penalty. As to the third and fifth factors, it does not appear that Defendants are in a position to commit further securities violations. As to the fourth and sixth factors, Defendants recognized their wrongdoing and cooperated with the investigation. As to the eighth factor, Defendants credibly contend that they are unable to pay any penalty whatsoever.

In its discretion, the Court acknowledges the extenuating factors raised and recognizes that Defendants' scheme as stipulated was not so pernicious and wide-ranging to warrant a maximum statutory penalty. The Court finds that these violations nevertheless warrant a $600,000 penalty, which appropriately exceeds the statutory maximum for a second-tier penalty, for each of Crowd Machine, Inc. and Metavine, Inc.

**IV. CONCLUSION**

Accordingly, the Court **GRANTS** the Motion **IN PART** and **DENIES** the Motion **IN PART**. The Court holds that Defendants are liable to disgorge, jointly and severally, $19,676,401.27 plus pre-judgment interest. This award of disgorgement is calculated by subtracting from the $33,499,206.21 that Defendants raised from investors (1) $13,748,904.94 in expenses that the SEC does not specifically contest and (2) $73,900.00 in legal fees related to advice for the token sale. The Court also finds that Relief Defendant Metavine Pvt. Ltd., as jointly and severally liable for the purposes of disgorgement, must disgorge $5,000,000.00 plus pre-judgment interest. The Court **ORDERS** the SEC to provide figures for pre-judgment interest through the date of the Judgment on the above amount, as well as payment instructions, within 7 days to allow for entry of a final disgorgement order consistent with this Order.

Defendant Crowd Machine, Inc. and Defendant Metavine, Inc. are each **ORDERED** to pay $600,000.00 to the SEC within 14 days after entry of this Order.

It is further **ORDERED** that the Commission may propose a plan to distribute the funds paid pursuant to this Order, subject to the Court's approval. Such a plan may provide that the funds shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the funds.

**IT IS SO ORDERED.**

Dated: December 5, 2023

HAYWOOD S. GILLIAM, JR.
United States District Judge